# United States Court of Appeals for the Federal Circuit

---

**NATIONAL FEDERATION OF FEDERAL EMPLOYEES, LOCAL 1442,**
*Petitioner*

**v.**

**DEPARTMENT OF THE ARMY,**
*Respondent*

---

2014-3175

---

Petition for review of an arbitrator's decision in FMCS Case No. 14-00370-1 by Arbitrator Roger P. Kaplan.

-------------------------------------------------------------------------

**NATIONAL FEDERATION OF FEDERAL EMPLOYEES, LOCAL 2109,**
*Petitioner*

**v.**

**WATERVLIET ARSENAL,**
*Respondent.*

---

2014-3189

---

Petition for review of an arbitrator's decision in FMCS Case No. A14-50680-6 by Arbitrator James A. Gross.

---

Decided:  October 20, 2015

---

STEFAN P. SUTICH, National Federation of Federal Employees, Washington, DC, argued for petitioners.

HILLARY A. STERN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondents.  Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., MARTIN F. HOCKEY, JR.

---

Before MOORE, SCHALL, and O'MALLEY, *Circuit Judges.*

SCHALL, *Circuit Judge.*

These related cases are appeals from arbitrators' decisions denying grievances filed by locals of the National Federation of Federal Employees ("NFFE" or "Union").  In the first appeal, *Nat'l Fed'n of Fed. Emps., Local 1442 v. Dep't of the Army*, No. 2014-3175 ("Appeal 3175"), NFFE Local 1442 filed a group grievance on behalf of 138 NFFE bargaining unit employees at Letterkenny Army Depot ("LEAD") in Chambersburg, Pennsylvania.  In the second appeal, *Nat'l Fed'n of Fed. Emps., Local 2109 v. Watervliet Arsenal*, No. 2014-3189 ("Appeal 3189"), NFFE Local 2109 filed two grievances on behalf of all of NFFE's bargaining unit employees at Watervliet Arsenal ("WVA") in Watervliet, New York.  In both the LEAD and WVA grievances, the Union challenged the furloughing of bargaining unit employees for six discontinuous days between July and September in Fiscal Year 2013.  The furloughs were the result of an automatic process of federal agency spending reductions known as "sequestration."

On June 13, 2014, Arbitrator Roger P. Kaplan ruled that the furloughs of the specified bargaining unit employees at LEAD were in accordance with law. He therefore denied the grievance filed by the Union on their behalf. *Nat'l Fed'n of Fed. Emps., Local 1442 v. Dep't of the Army*, FMCS Case No. 14-00370-1 (June 13, 2014) ("*LEAD Opinion*"). On July 7, 2014, Arbitrator James A. Gross ruled that the furloughs of bargaining unit security employees at WVA were not in accordance with law. He therefore sustained the grievance filed by the Union on their behalf. Arbitrator Gross also ruled, however, that the furloughs of non-security bargaining unit employees at WVA were in accordance with law. He therefore denied the grievance filed by the Union on behalf of those employees. *Nat'l Fed'n of Fed. Emps., Local 2109 v. Watervliet Arsenal*, FMCS Case No. A14-50680-6 (July 7, 2014) ("*WVA Opinion*").

In Appeal 3175, the Union appeals Arbitrator Kaplan's decision denying the group grievance it filed on behalf of 138 bargaining unit employees at LEAD. In Appeal 3189, the Union appeals Arbitrator Gross's decision denying the grievance it filed on behalf of non-security bargaining unit employees at WVA. In this opinion, we treat the arguments made in the two appeals conjointly. For the reasons set forth below, we affirm the decisions of the arbitrators in both appeals.

BACKGROUND

I.

LEAD serves as a maintenance depot, primarily performing maintenance on tactical missiles and ammunition. LEAD Joint Appendix ("J.A.") 256. It is subordinate to the Army's Aviation and Missile Command Life Cycle Management Command, which reports to the Army Materiel Command. *LEAD Op.* at 5. WVA is subordinate to the Army's Tank Automotive Command ("TACOM") Life Cycle Management Command, which also reports to

the Army Materiel Command. WVA supports the Life Cycle Management Command's responsibility for the development, acquisition, logistical support, and materiel readiness of the Army's tank automotive and armament systems. *WVA Op.* at 11; WVA J.A. 456, 462.

Both LEAD and WVA are Army Working Capital Fund ("AWCF") entities. Working capital funds ("WCF") were established by Congress under 10 U.S.C. § 2208 to help control and account for the cost of programs and work performed within the Department of Defense ("DOD"). *See* 10 U.S.C. § 2208(a); WVA J.A. 410. WCFs are created and controlled by the Office of the Secretary of Defense. 10 U.S.C. § 2208(a), (b), (e). The AWCF is shared by two activity groups: Industrial Operations and Supply Management. WVA J.A. 411. Both LEAD and WVA are Industrial Operations activities under the AWCF.

The primary customers of WCF entities are other DOD entities that transfer their own congressionally-appropriated funds to make "purchases" from WCFs. *See id.* 409–10. Thus, DOD entities are both the customer and the service-provider, with appropriated funds from the ordering entity's account being transferred to the WCF's account. In that way, after receiving initial working capital through appropriation, WCF entities are self-supporting and function from the fees charged for the services they provide.

Appropriated funds flow from a DOD customer to a WCF entity as work is performed by the WCF entity. *Id.* 410. When work is ordered from WCF entities and the work is funded (i.e., funds have been "obligated" for the work), but the work is not completed by the end of the fiscal year, the obligated funds are kept by the WCF entity as "carryover." *Id.* 466–467; DOD Financial Management Regulation, Vol. 2B, Chapter 9, 090207 (defining "carryover" as the "dollar value of work that has been

ordered and funded (obligated) by customers . . . , but not yet completed by [Defense Working Capital Fund] activities . . . at the end of the fiscal year"). Obligated funds can be de-obligated by a customer, even in the middle of a WCF entity's performance of ordered work. *E.g.*, WVA J.A. 107–08 at 86:15–87:25; LEAD J.A. 74 at 152:2–10.

Finally, DOD may transfer money in and out of WCF accounts to meet other needs. *See* 10 U.S.C. § 2208(r). Pursuant to § 2208(r)(1), however, a transfer of funds from a WCF, including a transfer of funds to another WCF, requires the Secretary of Defense to submit to the appropriate congressional committees, in advance, notification of the proposed transfer.

## II.

The sequestration of federal funds in Fiscal Year 2013 forms the backdrop for these appeals. On March 1, 2013, as a result of the Budget Control Act of 2011 ("Budget Control Act"), Pub. L. No. 112–25, §§ 101–103, 125 Stat. 240, 241–46 (2011), and the American Taxpayer Relief Act of 2012 ("Taxpayer Relief Act"), Pub. L. No. 112–240, § 901, 126 Stat. 2313, 2370 (2012), DOD's yearly budget was cut by $37 billion at a point roughly halfway through Fiscal Year 2013.[1]

---

[1]   The Budget Control Act and the Taxpayer Relief Act made amendments to the Balanced Budget and Emergency Deficit Control Act of 1985, Pub. L. No. 99–177, 99 Stat. 1038, which is codified in pertinent part at 2 U.S.C. § 901 *et seq.* The amendments established spending limits for agencies of the federal government and required automatic "sequestration" under certain statutory conditions. *See generally* 2 U.S.C. §§ 901–903. The Taxpayer Relief Act required the President to issue a sequestration order on March 1, 2013, in the middle of Fiscal Year 2013. 126 Stat. at 2370. On that date, Presi-

Operating under the specter of sequestration, on February 20, 2013, Secretary of Defense Leon Panetta issued an anticipatory memorandum titled "Preparations for Potential Sequestration on March 1 and Furlough Notifications." WVA J.A. 324–25. The purpose of the memorandum was to advise the DOD workforce of the possibility of furloughs as a result of reductions in spending and budgetary shortfalls.[2]   Following President Obama's March 1 order implementing budget reductions, incoming Secretary of Defense Chuck Hagel issued a memorandum on May 14, 2013, directing DOD managers to furlough most of the Department's civilian employees. *Id.* 296–98. The memorandum provided that "[f]urloughs will be imposed in every military department as well as almost every agency *and in our working capital funds.*" *Id.* 297 (emphasis added). In a July 2013 statement to Congress, Robert Hale, Under Secretary of Defense (Comptroller), officially estimated that "furloughs of all DOD civilians will save about $2 billion in [Fiscal Year] 2013, including more than $500 million associated with reduced personnel costs in working capital fund activities." *Id.* 398. Under Secretary Hale stated that "working capital fund personnel savings provide [DOD] the flexibility to adjust maintenance funding downward to meet higher-priority needs." *Id.*

---

dent Obama issued a sequestration order requiring reductions in spending from most federal budget accounts for Fiscal Year 2013. Sequestration Order, 78 Fed. Reg. 14,633 (Mar. 1, 2013).

[2]   "'Furlough' means the placing of an employee in a temporary status without duties and pay because of lack of work or funds or other nondisciplinary reasons." 5 U.S.C. § 7511(a)(5).

## III.

The facts pertinent to Appeal 3175 are not in dispute. In accordance with Defense Secretary Hagel's directives, LEAD notified its bargaining unit employees that it proposed to furlough them for not more than eleven days during July, August, and September 2013. LEAD J.A. 327–29.[3] The affected employees were provided with an opportunity to respond to the proposed furloughs. After consideration of their responses, LEAD issued final decisions rejecting requests for exceptions, thereby implementing the furloughs. *Id.* 66–67.

In due course, NFFE filed a group grievance on behalf of 138 bargaining unit employees at LEAD who received adverse final decisions. *Id.* 104–07. NFFE argued that, as a self-supporting WCF entity, LEAD was not faced with a funding shortfall and that, therefore, the furloughs did not promote the efficiency of the service by saving any costs. In support of its position, the Union argued that there were no reductions in customer orders from LEAD related to the sequestration. It pointed out that, going into Fiscal Year 2013, LEAD had carryover funds, with an estimated $400 million in orders. The Union further pointed out that LEAD, in fact, ended Fiscal Year 2013 with $778 million in orders—well over projections— despite the ongoing federal sequestration.

Pursuant to the Union's Collective Bargaining Agreement ("CBA"), the grievance proceeded to a hearing before Arbitrator Roger P. Kaplan. After the hearing, Arbitrator Kaplan found that the financial circumstances of DOD, rather than those specific to LEAD, were the proper focus for determining the validity of the furloughs.

---

[3]    On August 6, 2013, Defense Secretary Hagel reduced the number of furlough days for most DOD civilians from eleven to six. WVA J.A. 383.

In that regard, he concluded that LEAD could not be viewed as a separate entity from the rest of DOD. *LEAD Op.* at 27, 29. Arbitrator Kaplan stated that "NFFE['s] position and argument is . . . based largely on the notion that [LEAD] is self contained," which he believed failed to recognize that "[LEAD] is part of [DOD]." *Id.* at 27. Arbitrator Kaplan thus "rejected" NFFE's arguments regarding LEAD's budgetary surplus. He instead focused on DOD's decision to "save half a billion dollars by furloughing WCF employees," $5 million of which were saved by furloughing the LEAD bargaining unit employees. *Id.* at 29. Arbitrator Kaplan determined that WCF savings provided DOD potential "flexibility" to adjust maintenance funding downward to meet higher priority needs. In his view, the "furloughs were a reasonable solution to the Sequestration budget problems and therefore were taken for the efficiency of the service." *Id.* at 30. The Union's grievance was therefore denied.

IV.

The facts pertinent to Appeal 3189 also are not in dispute. Abiding by Defense Secretary Hagel's directives, WVA notified its bargaining unit employees that it proposed to furlough them between July and September 2013. Like the LEAD employees, the WVA employees were provided with an opportunity to respond to the proposed furloughs. In due course, the Deputy to the Commander of the TACOM Life Cycle Management Command denied all of the employees' requests for exceptions, thereby implementing the furloughs. WVA J.A. 136–39.

On July 8, 2013, NFFE filed two grievances in connection with the WVA furloughs. One grievance was filed on behalf of bargaining unit employees in security positions, while the other grievance was filed on behalf of all other bargaining unit employees. *Id.* 17–18, 246–47. Both grievances proceeded to a hearing before Arbitrator

James A. Gross in accordance with the Union's CBA. Arbitrator Gross sustained the grievance as to the security personnel. That decision is not at issue on appeal. However, he denied NFFE's grievance on behalf of all other bargaining unit employees. Arbitrator Gross rejected NFFE's argument that, because WVA had ample funds for Fiscal Year 2013 and ultimately suffered no de-obligation of funds, the furloughs did not promote the efficiency of the service. *WVA Op.* at 7–8, 11–13. Arbitrator Gross reasoned that "WVA is not an independent entity," but a "part of [DOD]." *Id.* at 11. In the "extraordinary financial situation" presented by sequestration, Arbitrator Gross found DOD's actions to be "reasonable management solutions." *Id.* at 12. He thus found the furloughs to be in accordance with law.

## V.

As noted above, in Appeal 3175, NFFE Local 1442 appeals Arbitrator Kaplan's decision denying the group grievance it filed on behalf of 138 bargaining unit employees at LEAD. In Appeal 3189, NFFE Local 2109 appeals Arbitrator Gross's decision denying the grievance it filed on behalf of non-security bargaining unit employees at WVA. We have jurisdiction over both appeals pursuant to 5 U.S.C. §§ 7121(f), 7703(b), and 28 U.S.C. § 1295(a)(9).

## DISCUSSION

## I.

When adverse actions which otherwise are appealable to the Merit Systems Protection Board ("Board") are submitted to arbitration under a CBA, we review the arbitrator's decision under the standard that we use when we review a decision of the Board. 5 U.S.C. §§ 7121(f), 7703(b); *see also Johnson v. Dep't of Veterans Affairs*, 625 F.3d 1373, 1376 (Fed. Cir. 2010). Our review is thus limited. We set aside an arbitrator's decision only if we find it to be: (1) arbitrary, capricious, an abuse of discre-

tion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *see also McCollum v. Nat'l Credit Union Admin.*, 417 F.3d 1332, 1337 (Fed. Cir. 2005).

Furloughs of thirty days or less constitute an adverse action by an agency. 5 U.S.C. § 7512; *see also Chandler v. Dep't of the Treasury*, 120 M.S.P.R. 163, 169–70 (2013). An agency may furlough an employee for lack of work or funds or other non-disciplinary reasons. 5 U.S.C. §§ 7511(a)(5), 7512(5). The agency, however, may only take such action if it "will promote the efficiency of the service." *Id.* § 7513(a). The "efficiency of the service" standard in a furlough case is satisfied by the agency demonstrating "that the furlough was a reasonable man-agement solution to the financial restrictions placed on it and that the agency applied its determination as to which employees to furlough in a 'fair and even manner.'" *Chandler*, 120 M.S.P.R. at 171 (quoting *Clark v. Office of Pers. Mgmt.*, 24 M.S.P.R. 224, 225 (1984)); *see also Berlin v. Dep't of Labor*, 772 F.3d 890, 895 (Fed. Cir. 2014) (citing *Clark* and *Chandler* as establishing the standard for "non-ALJ furloughs under 5 U.S.C. § 7513").

## II.

On appeal, NFFE does not challenge the arbitrators' findings that DOD experienced financial restrictions as a result of sequestration. Neither does the Union contend that the furloughs were not applied in a fair and even manner. Instead, the Union contests the arbitrators' determinations that the relevant financial circumstances for purposes of assessing the propriety of the furloughs were those of DOD rather than the local AWCF entities.

NFFE argues that, pursuant to 5 U.S.C., Chapter 75, LEAD and WVA, not DOD, were the proper "agencies" for purposes of assessing the validity of the furloughs. This

is so, the Union urges, because 5 U.S.C. § 7512(a) applies to a host of adverse actions, in addition to furloughs, that are taken at the local agency level, and not by the Secretary of Defense. Because adverse actions such as removals are effectuated by local agencies, the Union contends that furloughs must also be effectuated and analyzed from the perspective of the local level. The Union thus takes issue with the arbitrators' views that LEAD or WVA could not be considered separately from the rest of DOD. NFFE argues that the furloughs were not reasonable because LEAD and WVA each had no shortage of funds and, thus, could pay the salaries of the furloughed employees for the period of the furloughs. In addition, it contends that the fact that both LEAD and WVA employees continued to work during the budget crises in Fiscal Year 2014, when there was a government shutdown, proves that the furloughs during Fiscal Year 2013 were unnecessary.

Addressing the Union's contention that the language of 5 U.S.C., Chapter 75 dictates that LEAD and WVA are the relevant "agencies" for purposes of analyzing the furlough decisions, the Army (in Appeal 3175) and WVA (in Appeal 3189) argue that DOD is the only relevant "agency" specified by the statute. They argue that 5 U.S.C., Chapter 1, titled "Organization," divides federal "agencies" into five different groups. They point out that DOD is included in the first group of agencies, the Executive Departments, under 5 U.S.C. § 101, and that neither LEAD nor WVA are named in any of the five groups or in any other provision of Title 5. They thus argue that the statutory text supports the arbitrators' decisions to look to the financial circumstances of DOD rather than those of LEAD or WVA.

Beyond their statutory argument, the Army and WVA point out that AWCF entities are paid by DOD customers that obligate funds to WCF entities based on the cost of the orders placed. WCF entities, however, do not own the

funds until the ordered work is completed. *See* WVA J.A. 410. The Army and WVA further point out that obligated funds can be de-obligated by DOD customers at any time before the ordered work is completed. Thus, if ordered work is not in fact performed by a WCF entity, and consequently not then charged to obligated funds, DOD has greater flexibility to de-obligate funds and spend them elsewhere. In that way, the Army and WVA argue, WCF entities and DOD are financially interdependent. The nature of the relationship between WCF entities and DOD, they contend, provides substantial evidence demonstrating that a WCF entity cannot be treated separately from the rest of DOD.

### III.

In Appeal 3175 and Appeal 3189, we are faced with the same two questions: (1) whether the arbitrator erred in analyzing the efficiency of the service issue by focusing on DOD as a whole rather than on the local AWCF entity (LEAD or WVA); and (2) whether the arbitrator erred in ruling that the employer carried its burden of demonstrating that the furlough promoted the efficiency of the service. We conclude that, in both appeals, the arbitrators correctly focused on DOD as the relevant agency rather than on the local WCF entity. We also conclude that, in both appeals, substantial evidence supports the arbitrators' findings that the efficiency of the service standard was met. We consider first the arbitrators' focus on DOD rather than on LEAD and WVA.

Our analysis begins with the language of the statutory provisions authorizing furloughs of federal employees. Section 7513(a) states that "an *agency* may take an action covered by this subchapter [i.e. those listed in § 7512] . . . only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a) (emphasis added). Section 7512 provides that the subchapter "applies to . . . a furlough of 30 days or less." The term

"agency" is not defined in Chapter 75 of Title 5, under which §§ 7512 and 7513 are organized. Chapter 1 of Title 5, however, divides "Agencies Generally" into five different groups: (1) Executive departments (§ 101); (2) Military departments (§ 102); (3) Government corporations (§ 103); (4) Independent establishments (§ 104); and (5) Executive agencies (§ 105). DOD is included in the first group of agencies, "Executive departments." Specifically, § 105 provides that, "[f]or purposes of [Title 5], 'Executive agency' means an Executive department." Section 101, in turn, explains that "Executive departments" includes, among others, DOD. In contrast, Title 5 nowhere defines "agency" as specifically including WCF entities, such as LEAD and WVA, or any other agency subdivision or local employing office. Indeed, virtually every time the term "agency" is defined elsewhere in Title 5, the definition includes DOD, but never LEAD, WVA, or any other agency subdivision or local employing office. *See, e.g.*, 5 U.S.C. §§ 3132, 3701, 3581, 4701, 5351, 5381, 5402, 5521, 7103. The statutory language supports the arbitrators' decisions.[4]

---

[4] In our recent decision in *Vassallo v. Department of Defense*, 797 F.3d 1327 (Fed. Cir. 2015), we addressed whether the word "agency" in 5 U.S.C. § 3304(f)(1), a provision of the Veterans Employment Opportunities Act of 1998, Pub. L. No. 105–339, 112 Stat. 3182 ("VEOA"), means "Executive Agency." In *Vassallo*, the government argued that "agency" in § 3304(f)(1) refers to DOD, and not a subcomponent or sub-agency of DOD. We found the statutory scheme of the VEOA ambiguous on the question. We resolved the issue by deferring to the Office of Personnel Management's definition of "agency" in 5 C.F.R. § 315.611(b) for purposes of § 3304(f)(1). That regulation defines "agency" to mean "executive agency as defined in 5 U.S.C. [§] 105." *Vassallo*, 797 F.3d at 1331

We are not persuaded by NFFE's argument that the word "agency" in 5 U.S.C. § 7513(a) refers to the "local agency level" because the adverse actions listed in Chapter 75 include removals and suspensions, as well as furloughs, and those adverse actions (removals and suspensions) regularly are taken at the local level or duty station. Even assuming NFFE's proposition to be true, we see no basis for concluding that, because some adverse actions are implemented at the local level or at an affected employee's duty station, it necessarily follows that the determination of the validity of furloughs at a particular location arising from an agency-wide sequestration must be assessed from the standpoint of the local level or local duty station. In our view, such an approach ignores the fact that entirely different considerations are involved when assessing an adverse action, such as a removal or a suspension, as opposed to a furlough. In the former, the pertinent facts—the conduct of the employee and the resulting actions of his or her supervisors—are purely "local" in that they typically arise at the particular employee's duty station. In the case of the furloughs here, however, the actions at issue (the furloughs at the local level) were the result of financial restraints imposed on the entire agency, not just on particular subcomponents of the agency.

We find instructive the Board's decision in *Yee v. Deparement of the Navy*, 121 M.S.P.R. 686 (2014). The issue in *Yee* was whether the furloughing of a Navy attorney in response to the sequester and resulting DOD directives promoted the efficiency of the service, where the Navy had sufficient funding to avoid the furlough. In *Yee*, the Board reasoned that, "[a]lthough the Navy may ordinarily

_____

(quoting 5 U.S.C. § 315.611(b)). We have no interpretation of "agency" in § 7513(a) to defer to here. Our decision is nonetheless consistent with the result in *Vassallo*.

show that an action promotes the efficiency of the service by establishing a connection or nexus that relates solely to the operations of the Navy, . . . section 7513(a) is not so limiting under the facts of this case." *Id.* at 692. The Board found that the requirements of § 7513(a) "can be met by showing a connection or nexus between the action in question and the efficiency of the civil service *more generally.*" *Id.* (emphasis added). In *Yee*, the Board noted that, "although the Navy is separately organized under the Secretary of the Navy, it operates under the authority, direction, and control of the Secretary of Defense." *Id.* at 693. The Board pointed out that "the Secretary of the Navy is responsible to the Secretary of Defense for, among other things, 'the effective and timely implementation of policy, program, and budget decisions and instructions of the President or the Secretary of Defense relating to the functions' of the Navy." *Id.* (quoting 10 U.S.C. § 5013(c)(3)). The Board concluded: "[W]e agree with the administrative judge that, although the appellants asserted that the Navy had adequate funding to avoid the furloughs, it was reasonable for DOD to consider its budget situation holistically, rather than isolating each individual military department's situation."[5] *Id.*

---

[5]    In resolving cases involving employees furloughed during sequestration, the Board has issued a series of precedential and non-precedential opinions following the same rationale as in *Yee*. *See, e.g.*, *Einboden v. Dep't of the Navy*, 122 M.S.P.R. 302 (2015), *aff'd*, No. 2015-3117, 2015 WL 5730370 (Fed. Cir. Oct. 1, 2015); *Furtek v. Dep't of the Navy*, No. SF-0752-13-2167-I-1, 2015 WL 3830294 (M.S.P.B. June 22, 2015) (unpublished); *AR Fort Leavenworth, KS v. Dep't of Army*, No. DE-0752-13-1962-I-1, 2015 WL 3794440 (M.S.P.B. June 18, 2015) (unpublished); *Office of the Sec'y v. Dep't of Def.*, No. DC-0752-14-0624-I-1, 2015 WL 1655544 (M.S.P.B. Apr. 14,

As noted above in Part I of the Background section, LEAD and WVA are WCF subcomponents of the Army Materiel Command. The Department of the Army "is separately organized under the Secretary of the Army." 10 U.S.C. § 3011. "It operates," however, "under the authority, direction, and control of the Secretary of Defense." *Id.* The Secretary of the Army is therefore "responsible to the Secretary of Defense for . . . the effective and timely implementation of policy, program, and budget decisions and instructions of the President or the Secretary of Defense relating to the functions of the Department of the Army." *Id.* § 3013(c)(3). Under these circumstances, and in view of the fact that WCF entities are created and controlled by the Office of the Secretary of Defense, we think logic and common sense compel the conclusion that, when faced with sequestration, "it was reasonable for DOD to consider its budget situation holistically, rather than isolating [LEAD's and WVA's] situation." *Yee*, 121 M.S.P.R. at 693. The arbitrators did not err in focusing their analyses on the financial circumstances of DOD rather than on those of LEAD and WVA.

## IV.

We turn now to the question of whether substantial evidence supports the arbitrators' decisions that the Army and WVA carried their burdens of demonstrating that the 2013 furloughs promoted the efficiency of the service. In both Appeal 3175 and Appeal 3189, we hold that the arbitrators' decisions are supported by substantial evidence.

---

2015) (unpublished); *Will v. Dep't of the Navy*, No. DC-0752-13-4673-I-1, 2015 WL 1284270 (M.S.P.B. Mar. 20, 2015) (unpublished); *Moser v. Dep't of the Navy*, No. DC-0752-13-2643-I-1, 2015 WL 892796 (M.S.P.B. Mar. 3, 2015) (unpublished).

As noted, the DOD components that are LEAD's and WVA's usual customers are funded by congressionally-appropriated funds. Those funds are used to pay for the work performed by LEAD and WVA. When work is performed by LEAD or WVA, appropriated funds flow from the DOD customer to LEAD or WVA. *See* WVA J.A. 410. However, funds obligated to AWCF entities can and have been de-obligated by customers for a number of reasons—even in the middle of the performance of work. LEAD J.A. 74 at 152:2–10 (Colonel Victor Hagan, LEAD Deputy Commander, testifying that "[f]unds that are obligated can be deobligated anytime"); *id.* 70 at 133:14–19 (Scott Molony, Director of Resource Management at LEAD, testifying that over $37.5 million in funds were de-obligated in Fiscal Year 2013 at LEAD); WVA J.A. 107–08 at 86:15–87:25 (John Genuit, Deputy Chief of Staff of Resource Management for TACOM, stating that WCF customers could "at any point" either cancel an order that had been placed or reduce its scope). In the wake of sequestration, in addition to the desire to reduce payroll expenses, it was the potential diversion or de-obligation of funds by DOD customers—which would result in a reduced scope in work orders or the transfer of funds away from WCFs—that formed the basis for DOD's decision to furlough employees at LEAD and WVA. *See* WVA J.A. 389–95 (Declaration of Under Secretary of Defense Robert Hale); *id.* 397–98 (Letter of Under Secretary of Defense Hale to Congressman Derek Kilmer).

The evidence in the record supports the arbitrators' decisions to credit DOD's rationale. The sequester placed extraordinary financial constraints on DOD during ongoing wartime conditions. At the same time, there is evidence indicating that DOD notified Congress of its intention to transfer money from WCFs, if such action became necessary. WVA J.A. 393–95 (Declaration of Under Secretary Hale). In addition, LEAD's Deputy Commander, Colonel Victor Hagan, stated that, during

the period after 2004, $6.9 billion was transferred out of the AWCF "to cover other Army higher priorities." LEAD J.A. 74–75 at 152:18–153:10; *see also* WVA J.A. 420–21 (setting forth yearly charts showing that "[s]ince FY 2004 approximately $6.9 billion [was] transferred from the AWCF"). Colonel Hagan also testified that delaying work to be performed by AWCF entities gave the Army spending flexibility because it meant that fewer dollars would be spent from congressionally-obligated funds. LEAD J.A. 77 at 161:20–163:2. Similar testimony regarding the "flexibility" that the furloughs provided was presented in the arbitration hearing relating to the WVA furloughs. WVA J.A. 106, 108. Further, in a September 16, 2013, declaration, Under Secretary of Defense Hale explained that, during Fiscal Year 2013, DOD had sought permission from Congress to reprogram funds, and that it had exercised its own authority as well to reallocate funds to support priority activities. *Id.* 393–95.

We, like the arbitrators, must base our review of the agency's decision on the circumstances it faced when the furlough decisions were made, and not on events that did or did not occur at a later date. *E.g.*, *Clerman v. Interstate Commerce Comm'n*, 35 M.S.P.R. 190, 194 (1987) (an agency's decision to release employees by reduction in force is judged based on the agency's ceilings when the actions were taken). From that perspective, in the period immediately after March 1, 2013, it was reasonable for DOD to determine that savings from furloughing WCF employees would be part of an overall effort to reduce expenditures in the face of decreased funding resulting from budget reductions. We therefore conclude that Arbitrators Kaplan and Gross had substantial evidence before them demonstrating that the furlough decisions were reasonable management solutions to the financial restrictions placed on DOD by the sequester, thus promoting the efficiency of the service.

We find unpersuasive NFFE's argument that the fact that no LEAD or WVA employees were furloughed during the government shutdown that occurred in October 2013, Fiscal Year 2014, demonstrates that the furloughs in Fiscal Year 2013 were unreasonable and unnecessary. The Union argues that, if, as the Army and WVA urge, LEAD and WVA are properly viewed as under the umbrella of DOD rather than as independent entities, then they *necessarily* should have been adversely impacted and required to lay off employees when Congress did not enact DOD's annual appropriations bill for Fiscal Year 2014. NFFE reasons that, if appropriated money really could have been saved through furloughs in Fiscal Year 2013, then layoffs during the shutdown in Fiscal Year 2014 necessarily should have taken place also.

The fact that no LEAD or WVA employees were laid off in October 2013 does not undermine the arbitrators' findings that the furloughs at LEAD and WVA, in Fiscal Year 2013, promoted the efficiency of the service. NFFE's argument ignores that it was reasonable for DOD to base its furlough decisions at LEAD and WVA on the situation that existed on May 14, 2013, when, in the face of President Obama's sequestration order, Defense Secretary Hagel ordered the furloughs that are at issue. *See Cross v. Dep't of Transp.*, 127 F.3d 1443, 1447–48 (Fed. Cir. 1997) (finding that "[c]onducting a [reduction in force ("RIF")] because of an anticipated shortage of funds does not require that the shortage exist at the time of the RIF" and that whether an agency "reasonably anticipated a budgetary shortfall" is a question of fact based on credibility determinations). NFFE's argument also ignores the fact that LEAD and WVA were able to continue operating during the shutdown in Fiscal Year 2014 because they had sufficient funds due to the fact that, as explained above, they were authorized to carry over funds from Fiscal Year 2013. *See* WVA J.A. 466–67. NFFE's argument thus fails.

Finally, our holding today is consistent with this court's recent decision in *Einboden v. Department of the Navy*, No. 2015-3117, 2015 WL 5730370 (Fed. Cir. Oct. 1, 2015). *Einboden* involved an appeal by a civilian employee of the Navy from a decision of the Board affirming the action of the Navy furloughing him for six days in July and August 2013 pursuant to the sequester. Mr. Einboden, who worked at a Navy WCF entity, argued that the government could not show that his furlough promoted the efficiency of the service because the WCF at which he worked never suffered a budgetary shortfall. In affirming the Board's decision, we left undisturbed the Board's finding that, "although [the WCF entity at which Mr. Einboden worked] may have had adequate funding to avoid a furlough . . . , it was reasonable for DOD to consider its budget situation holistically, rather than isolating the situation of each individual Navy organization or component." *Einboden*, 122 M.S.P.R. at 309. In addition, we rejected the proposition that the Navy was "required to show actual re-programming of the funds saved by [the] furlough" in order to meet the efficiency of the service standard. *Einboden*, 2015 WL 5730370, at *3. We also rejected the notion that "subsequent," "ameliorat[ing]" events could undermine the reasonableness of a managerial decision based on a prospective budgetary shortfall. *Id.*

## CONCLUSION

For the foregoing reasons, we hold that Arbitrator Kaplan, in Appeal 3175, and Arbitrator Gross, in Appeal 3189, did not err in finding that the furloughs of bargaining unit employees at LEAD and WVA in Fiscal Year 2013 due to sequestration promoted the efficiency of the service and were in accordance with law. We therefore affirm the arbitrator's decision in Appeal 3175 and the arbitrator's decision in Appeal 3189.

## **AFFIRMED**

COSTS

Each party shall bear its own costs.