# United States Court of Appeals for the Federal Circuit

---

**VICTORIA SNYDER,**
*Petitioner*

**v.**

**DEPARTMENT OF THE NAVY,**
*Respondent*

---

2016-1940

---

Petition for review of the Merit Systems Protection Board in No. DC-0752-13-6201-I-1.

---

Decided: April 26, 2017

---

MICHAEL GRAHAM, Fredericksburg, VA, argued for petitioner.

HILLARY STERN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., ALLISON KIDD-MILLER.

---

Before REYNA, LINN, and CHEN, *Circuit Judges*.

CHEN, *Circuit Judge*.

Victoria Snyder appeals the Final Decision of the Merit Systems Protection Board (Board) affirming the decision of the Department of the Navy (Navy) to furlough her for six days between July and September of 2013 as a result of the federal government sequestration of 2013. Because we find no reversible error in the Board's decision, *we affirm*.

BACKGROUND

I.

This case is one of many that arise from the sequestration legislation adopted by Congress (i.e., the Budget Control Act of 2011 and the American Taxpayer Relief Act of 2012).[1] *See, e.g.*, *Calhoun v. Dep't of the Army*, 845 F.3d 1176, 1177 (Fed. Cir. 2017); *Nat'l Fed'n of Fed. Emps., Local 1442 v. Dep't of the Army*, 810 F.3d 1272, 1273–75 (Fed. Cir. 2015) (*NFFE*); *Einboden v. Dep't of the Navy*, 802 F.3d 1321, 1323 (Fed. Cir. 2015). As a result of this

---

[1]    The Budget Control Act of 2011, Pub. L. No. 112-25, §§ 101–103, 125 Stat. 240, 241–46, and the American Taxpayer Relief Act of 2012, Pub. L. No. 112-240, § 901, 126 Stat. 2313, 2370, made amendments to the Balanced Budget and Emergency Deficit Control Act of 1985, Pub. L. No. 99-177, 99 Stat. 1038, which is codified in pertinent part at 2 U.S.C. §§ 901 *et seq*. The amendments established spending limits for agencies of the federal government and required automatic "sequestration" under certain statutory conditions. *See generally* 2 U.S.C. §§ 901–03. The American Taxpayer Relief Act required the President to issue a sequestration order on March 1, 2013, in the middle of Fiscal Year 2013. 126 Stat. at 2370. On that date, President Obama issued a sequestration order requiring reductions in spending from most federal budget accounts for Fiscal Year 2013. Sequestration Order, 78 Fed. Reg. 14,633 (Mar. 1, 2013).

legislation, the 2013 budget of the Department of Defense (DOD) was cut by $37 billion approximately halfway through Fiscal Year 2013. DOD took a number of steps to address the dramatic budgetary shortfall for the fiscal year, including reprogramming funds, reducing facility maintenance, and eliminating some military training exercises.

On May 14, 2013, the Secretary of Defense (SECDEF) issued a memorandum directing DOD managers to prepare to furlough[2] most DOD civilian employees for up to eleven workdays in fiscal year 2013. As explained in the SECDEF memorandum, sequestration reduced DOD operation and maintenance (O&M) accounts that pay many civilian DOD employees, and although DOD considered and implemented various actions to reduce the budgetary shortfall, a shortfall nevertheless remained which would be addressed through furloughs of civilian employees. The memorandum provided that "[f]urloughs will be imposed in every military department as well as almost every agency and in our working capital funds." J.A. 183. In an attachment to the memorandum, the SECDEF provided a list of approved furlough exceptions, which included employees deployed to a combat zone, those whose jobs are necessary to protect safety of life and property, Navy Shipyard employees, National Intelligence Program employees, Foreign Military Sales employees, political appointees, non-appropriated fund instrumentality (NAF) employees, foreign national employees, and various types of employees not paid directly by DOD-Military accounts.

---

[2] "'[F]urlough' means the placing of an employee in a temporary status without duties and pay because of lack of work or funds or other nondisciplinary reasons." 5 U.S.C. § 7511(a)(5).

Subsequently, on June 21, 2013, a bipartisan group of thirty-one members of Congress sent a letter to the Secretary of Defense expressing concern about the determination that civilian workers at entities funded through Defense working capital funds (WCFs) would also be subject to furlough. WCFs are created and controlled by the Office of the SECDEF. 10 U.S.C. § 2208(a), (b), (e). They function "entirely from the fees charged for the services [provided] consistent with [its] statutory authority." *Einboden*, 802 F.3d at 1323 (citing U.S. Gov't Accountability Office, GAO–05–734SP, A Glossary of Terms Used in the Federal Budget Process 101 (2005)). After receiving initial working capital through appropriation, WCF entities are self-supporting and function from the fees charged for the services they provide to their customers. *NFFE*, 810 F.3d at 1274. The primary customers of WCF entities are other DOD entities that transfer their own congressionally-appropriated funds to make "purchases" from WCFs. *Id.* Robert Hale, Under Secretary of Defense (Comptroller), on behalf of the SECDEF, responded to the congressional inquiry regarding WCFs in a July 2013 statement to Congress, explaining that "furloughs of all DOD civilians will save about $2 billion in fiscal year 2013, including more than $500 million associated with reduced personnel costs in working capital fund activities. These working capital fund personnel savings provide us the flexibility to adjust maintenance funding downward to meet higher-priority needs." J.A. 85–86. Thus, in accordance with the SECDEF directive, implementation of the furloughs generally proceeded across DOD, including WCF entities.

## II.

Ms. Snyder was a civilian mechanical engineer at the Naval Surface Warfare Center, Dahlgren Division (Dahlgren) at the time of the sequestration. Dahlgren is a Navy WCF entity. *See Einboden*, 802 F.3d at 1323. On May 28, 2013, Ms. Snyder—as well as numerous other

Dahlgren employees—received a Notice of Proposed Furlough indicating that the Navy planned to furlough her for a period of up to eleven workdays days because of "the extraordinary and serious budgetary challenges[,] . . . the most serious of which is the sequester." J.A. 834.

At that time, Ms. Snyder worked full-time on a Lockheed Martin Advanced Shipboard Weapons Control (ASWC) project to modify existing weapons control software. The ASWC project was governed by a Cooperative Research and Development Agreement (CRADA) between Dahlgren and Lockheed Martin, signed in September 2012. Pursuant to the ASWC CRADA, both parties would provide expertise and engineering support. Lockheed Martin was solely responsible for funding the project, providing $2.6 million in 2012, paid to the Treasurer of the United States. According to the CRADA's terms, any unused funds remaining at the completion of the project in 2015 were to be remitted to Lockheed Martin following Dahlgren's submission of a final fiscal report.

On May 30, 2013, Lockheed Martin sent a letter to the Navy requesting that the Dahlgren employees supporting the ASWC CRADA—including Ms. Snyder—be exempt from furlough. The letter argued that the project was fully funded by Lockheed Martin Independent and Research Development (IRAD) funds and not Federal appropriations, and therefore, it "should be viewed as third-party funding like Foreign Military Sales (FMS) funding [one of the express exceptions identified in the SECDEF memorandum]." J.A. 933. Ms. Snyder filed a written reply on June 10, 2013, to the proposed furlough, echoing Lockheed Martin's view that her work for the Lockheed Martin-funded ASWC CRADA should be exempted from furlough like the listed SECDEF exceptions. In a letter

dated June 24, 2013, the Navy deciding official responded to Ms. Snyder, denying her request.[3]

III.

Ms. Snyder petitioned the Board for review, asserting that the Navy had improperly furloughed her. Her case was consolidated with thirty-nine other furloughed Dahlgren employees. An administrative judge (AJ) conducted a consolidated hearing on July 8, 2015.

For her part, Ms. Snyder argued that, because she was working full-time in support of the Lockheed Martin-funded ASWC CRADA, her situation was akin to those exceptions identified by the SECDEF. In support of her argument, Ms. Snyder requested the AJ take official notice of the Federal Technology Transfer Act of 1986, codified at 15 U.S.C. §§ 3701 *et seq.*, as well as DOD Instruction 5535.8, "DOD Technology Transfer (T2) Program," May 14, 1999, which prescribes procedures for implementing technology transfer programs, including CRADAs. She argued that these provisions collectively (i) prohibit the federal government from providing funds to a non-government CRADA participant; and (ii) obligate the government to maintain separate and distinct accounts to track CRADA funds. Thus, she argued that she was not paid out of government-appropriated funds, like typical WCF employees, and her work should have been exempted from the furlough because her furlough could not have assisted in reducing DOD's budgetary shortfall.

---

[3] Because of other cost-cutting measures and reprogramming requests approved by Congress, DOD was able to close the budget gaps more easily than it had initially anticipated. On August 6, 2013, the SECDEF announced that the furlough of civilian defense employees would be reduced from eleven to six days.

Ms. Snyder also argued that the Navy improperly provided some, but not all, furloughed employees assigned to work on the ASWC CRADA with an opportunity to earn overtime pay to mitigate the economic impact of the furlough. In support, she offered the testimony of Mr. Larry Fontenot, a fellow ASWC CRADA employee. Mr. Fontenot testified that he and others working on the project were permitted to work overtime during the furlough time period and that he believed this was a result of a compromise struck by management to make up for the furlough days. This "compromise," Ms. Snyder argued, demonstrates that the Navy did not apply the furlough in a fair and even manner.

For its part, the Navy explained that all Dahlgren employee salaries—regardless of funding source—are paid directly from the WCF. Ms. Kathy Clark, Deputy Comptroller for Dahlgren, testified that when a WCF employee like Ms. Snyder performs work on a job requested by a customer, the customer does not directly pay the employee's salary; rather, the WCF employee's salary is paid from the WCF. The Navy argued that by not paying Ms. Snyder's salary for six days, it realized a savings in the WCF at the time of the furlough, just as with every other employee paid from the WCF. Thus, the Navy explained, even if it would be required to pay back Lockheed Martin certain monies in a later, subsequent fiscal year—upon the completion of the project—the Navy still realized an immediate benefit at that specific point in time in 2013 in responding to the sequestration.

## IV.

On September 11, 2015, the AJ issued an Initial Decision in the consolidated case and found Snyder's furlough was a reasonable management solution to the shortage of funds caused by sequestration and therefore promoted the efficiency of the service. The AJ acknowledged that Ms. Snyder cited "numerous agency regulations concerning

the proper administration of CRADA funds," J.A. 23, but credited the testimony of the Navy witnesses that all Dahlgren employees, including CRADA employees, are paid from the WCF. Thus, in that relevant sense, the AJ concluded, "she is no different from other employees who were furloughed." *Id.*

The AJ also concluded that there was no evidence to support Ms. Snyder's claim that the furlough was unfairly applied. The AJ found that Mr. Fontenot's testimony established only that he "assumed" the Navy paid him and others the requested overtime to mitigate the effects of the furlough. J.A. 24. The AJ also found there was no evidence that Ms. Snyder even requested overtime pay, further undercutting her claim that similarly situated employees were treated differently. *Id.*

Ms. Snyder filed a petition for review with the Board. On March 18, 2016, the Board issued a Split Vote Order, indicating that the two members of the Board could not agree upon a disposition. As a result, the AJ's Initial Decision became the Final Decision of the Board. 5 C.F.R. § 1200.3(b). Ms. Snyder now seeks review of the Board's Final Decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

DISCUSSION

I.

Our authority to review a decision of the Board is limited by statute. We may set aside the Board's decision only if it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c); *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1366 (Fed. Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Berlin v. Dep't of Labor*, 772 F.3d 890, 894 (Fed. Cir. 2014).

An agency may furlough an employee for lack of work or funds or other non-disciplinary reasons. 5 U.S.C. §§ 7511(a)(5), 7512(5). Because furloughs of thirty days or less are deemed adverse employment actions, the agency must demonstrate that the furlough "will promote the efficiency of the service." *NFFE*, 810 F.3d at 1277 (quoting 35 U.S.C. § 7513(a)). This means that the agency's decision must "be a reasonable management solution to the financial restrictions placed on the agency" and that the agency must "determine which employees to furlough in a fair and even manner." *Einboden*, 802 F.3d at 1325; 5 U.S.C. § 7513(a); 5 C.F.R. § 1201.56(a)(1)(ii) (2015).

## II.

Ms. Snyder first takes aim at the Board's "reasonable management solution" analysis.

### A.

She contends, as an initial matter, that the AJ's decision failed to discuss the controlling law and facts and, therefore, did not constitute a reasoned opinion providing an adequate basis for review under the Board's regulations. 5 C.F.R. § 1201.111(b)(1); *Spithaler v. Office of Pers. Mgmt.*, 2 MSPB 2, 1 M.S.P.R. 587, 588–89 (1980). Ms. Snyder argues that the Initial Decision "devoted a negligible 359 words concerning the facts and the law pertaining to the CRADA." Brief of Petitioner at 27. Moreover, she asserts the decision also "fails to summarize [Ms. Snyder's] Post-Hearing Brief that thoroughly discusses the Federal Technology Transfer Act." *Id.* at 28.

We reject Ms. Snyder's argument regarding the sufficiency of the AJ's analysis for multiple reasons. In *Spithaler*, on which Ms. Snyder relies, the Board held that a three-sentence initial decision, which simply announced the administrative judge's disposition of the case

without any analysis, failed to satisfy the regulatory requirement of 5 C.F.R. § 1201.111(b)(1). 1 M.S.P.R. at 588–89. The Initial Decision's analysis in this case was qualitatively more meaningful compared to the complained-of analysis in *Spithaler*. Within the 26-page opinion, the AJ dedicated multiple pages to addressing Ms. Snyder's specific claims and its reasoning for upholding Ms. Snyder's furlough.

We also reject Ms. Snyder's argument that the AJ was required to summarize all of the arguments raised in her briefing. The mere fact that the AJ did not recount these arguments as thoroughly as Ms. Snyder would like does not mean that the AJ did not sufficiently consider them. *See, e.g.*, *Synopsys, Inc. v. Mentor Graphics Corp.,* 814 F.3d 1309, 1322 (Fed. Cir. 2016) (noting that an agency is "not require[d] . . . to address every argument raised by a party or explain every possible reason supporting its conclusion"); *Gonzales v. West*, 218 F.3d 1378, 1381 (Fed. Cir. 2000) ("[A]bsent specific evidence indicating otherwise, all evidence contained in the record . . . must be presumed to have been reviewed by [the agency]."); *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986) ("We presume that a fact finder reviews all the evidence presented unless [the fact finder] explicitly expresses otherwise.").

Here, the AJ identified the principal legal issue, summarized the facts material to resolving that issue, and made clear the reasoning that led the AJ to reject Ms. Snyder's claim. The Initial Decision recognized that the funding source for the CRADA originated from a nongovernment entity, i.e., Lockheed Martin. It also acknowledged the regulations concerning the proper administration of CRADA funds. The AJ, however, found these considerations were not dispositive, because the Navy's unrebutted evidence showed that Ms. Snyder's salary, like all other WCF employees' salaries, was paid directly from the WCF, regardless of funding source for

the project to which she was presently assigned. The AJ therefore reasoned that, for reasons of responding to the sequestration, Ms. Snyder, as a WCF employee, was no different from other WCF employees who were furloughed. We conclude that the AJ's analysis sufficiently articulates its rationale and the factual underpinnings supporting its decision to affirm Ms. Snyder's furlough.

B.

Ms. Snyder next argues that the decision to affirm her furlough is nevertheless unsupported by substantial evidence. According to Ms. Snyder, the above-cited statutory and regulatory authority and the plain terms of the CRADA establish that the funds used to pay her salary did not involve an appropriation of the United States, but rather, they originated from non-Federal funds that cannot be spent for a non-CRADA purpose. Further, Ms. Snyder argues the Navy was required to return to Lockheed Martin any excess funds at the end of the CRADA project, which underscores that the funds belong to Lockheed Martin, not the government. Ms. Snyder therefore contends that, just as with the already recognized SECDEF exceptions, neither Dahlgren nor the Navy nor DOD could save any money by furloughing her.

Even accepting that the ASWC CRADA was funded solely with non-appropriations monies, we disagree that the funding source is dispositive of the question on appeal. Rather, we agree with the AJ that the fact Ms. Snyder was a WCF employee directly paid from the WCF, bears considerable weight on the reasonableness of the agency's furlough decision.[4]

---

[4]    Ms. Snyder also takes issue with the reliability of Ms. Clark's testimony that all Dahlgren employees are paid directly from the WCF, regardless of funding source. Credibility determinations made by the Board are "virtu-

Agencies have broad discretion to take actions to control spending, preserve flexibility, and adjust priorities in response to sequestration. "We give wide berth to agency decisions as to what type of adverse action is necessary to 'promote the efficiency of the service,' provided that the agency's decision bears some nexus to the reason for the adverse action." *Einboden*, 802 F.3d at 1325–26 (quoting 5 U.S.C. § 7513(a)). We have also previously explained that, when faced with sequestration, it is reasonable for an agency "to consider its budget situation holistically," rather than isolating the situation of each individual organization or component. *Id.* at 1324–25; *NFFE*, 810 F.3d at 1282.

In both *Einboden* and *NFFE*, this court upheld the decision to furlough WCF employees who, like Ms. Snyder, worked at WCF entities and were furloughed in accordance with the SECDEF's direction to furlough WCF employees. In both cases, endorsing the holistic view of budget management, we explained that the decision to furlough employees paid by a WCF was a reasonable management solution to the budget shortfall because, among other reasons, preserving money in the WCFs generally provided DOD with the flexibility to meet higher priority needs during that critical time period. *See Einboden*, 802 F.3d at 1325; *NFFE*, 810 F.3d at 1282.

Here too there is a sufficient nexus between the decision to furlough Ms. Snyder and the sequestration. DOD was faced with a sudden, dramatic, agency-wide funding

---

ally unreviewable." *Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed. Cir. 1986). Because Ms. Snyder's proffered evidence regarding the treatment of CRADA funds does not directly contradict Ms. Clark's testimony that all Dahlgren employees are paid from the WCF, the AJ's decision to credit Ms. Clark's testimony is supported by substantial evidence.

shortfall. As part of the measures to adapt to this shortfall, DOD implemented agency-wide furloughs of civilian employees with only limited exceptions, which DOD estimated would save it about $2 billion. The Navy's decision to furlough WCF employees was a reasonable management solution consistent with the SECDEF's direction. Even though Ms. Snyder was working at the time of her furlough on a project based on funds that originated from a non-government entity, she, like the other employees at Dahlgren, was a WCF employee and, critically, her salary was paid from the WCF, just like the other furloughed Dahlgren employees. Not paying Ms. Snyder's salary on those six days in 2013 thus preserved money in the WCF, which in turn provided DOD with added flexibility to manage its budget shortfall that year, just as with the furlough of every other WCF employee.

We find unpersuasive Ms. Snyder's argument that the government would not realize any savings from her furlough. While it is true that, at the completion of the CRADA project in 2015, any unused monies would return to Lockheed Martin, not the Navy, that does not change our conclusion. "We . . . must base our review of the agency's decision on the circumstances it faced when the furlough decisions were made, and not on events that did or did not occur at a later date." *NFFE*, 810 F.3d at 1281. During the relevant time period in May 2013, it was reasonable for the Navy to determine that savings from furloughing all WCF employees—including those currently working on CRADA projects—would be part of an overall effort to reduce expenditures in the face of decreased funding resulting from budget reductions during that fiscal year. And even if the savings realized by the WCF were only temporary (because the Navy could potentially have to return unused monies to Lockheed two years later in 2015), the Navy still derived a benefit by not having to pay Ms. Snyder's salary during that critical time period.

Finally, we reject Ms. Snyder's additional argument, raised for the first time in her reply brief, that her situation fits within the definition of exception (i) from the SECDEF memorandum, pertaining to funding sources outside of the DOD-military budget. This argument was waived. It is well-established that an agency is not required to respond to arguments that were never made to the agency. For example, in *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the Supreme Court declined to consider a challenge to an agency action on the basis that the agency "fail[ed] properly to consider possible alternatives," where the challengers "did not raise these particular objections" to the agency. *Id.* at 764–65 ("Respondents have therefore forfeited any objection to the [action] on the ground that it failed adequately to discuss potential alternatives to the proposed action."). Ms. Snyder argued below only that her situation was similar in kind to those SECDEF exceptions with funding sources from outside of the government, including exceptions (e) (Foreign Military Sales) and (g) (nonappropriated funds), because furloughing her would similarly not assist DOD in reducing its budgetary shortfall. For the reasons explained above, the AJ correctly rejected that argument and concluded it was reasonable to treat Ms. Snyder like the other WCF employees, and doing so would in fact help DOD respond to its budget shortfall.

We find the argument lacking in any event. SECDEF exception (i) pertains only to "employees who are not paid directly by accounts included in the Department of Defense-Military (subfunction 051) budget." J.A. 186. The evidence presented below established that Ms. Snyder, as a WCF employee, was paid directly from the WCF. And Ms. Snyder presents no evidence to support the conclusion that the Navy WCF is outside of the DOD (subfunction 051) budget. Nor could she, as the various DOD WCFs were expressly targeted for furloughs by the very same SECDEF memorandum that established exception (i).

Thus, the AJ did not err in failing to find Ms. Snyder should have been excepted from the furlough pursuant to SECDEF exception (i).

We therefore conclude that substantial evidence supports the AJ's decision that the furlough of Ms. Snyder was a reasonable management solution to the financial restrictions placed on the Navy due to sequestration and thus promoted the efficiency of the service.

## III.

Ms. Snyder argues that the Board also misevaluated the evidence demonstrating that the Navy failed to apply the furlough in a fair and even manner. According to Ms. Snyder, her testimony and Mr. Fontenot's testimony that some ASWC CRADA employees received overtime was both unrebutted and dispositive. She argues that the AJ found against her only because the Navy was permitted to introduce additional evidence on this score after the record was closed, in violation of Board regulation 5 C.F.R. § 1201.58(c) (2015).[5]

As an initial matter, we see no error in the AJ's finding that Mr. Fontenot's testimony amounted to nothing more than speculation that the approval of specific overtime requests was somehow related to employee fur-

---

[5] That regulation provides, in pertinent part:

(c) Once the record closes, additional evidence or argument will ordinarily not be accepted unless:

> (1) The party submitting it shows that the evidence or argument was not readily available before the record closed; or

> (2) It is in rebuttal to new evidence or argument submitted by the other party just before the record closed.

loughs. Moreover, Ms. Snyder presented no evidence that any of the furloughed ASWC CRADA employees had overtime requests denied and she admitted to never actually requesting overtime during the relevant time period. Thus, as the AJ recognized, Ms. Snyder's proffered testimony that those ASWC CRADA employees received overtime when requested does not, without more, establish that similarly treated employees were treated differently.

We also ascertain no reversible error in the Board's admission of the Navy's rebuttal evidence. "Procedural matters relative to discovery and evidentiary issues fall within the sound discretion of the board and its officials." *Curtin v. Office of Pers. Mgmt.*, 846 F.2d 1373, 1378 (Fed. Cir. 1988). We "will not overturn the board on such matters unless an abuse of discretion is clear and is harmful." *Id.* Ms. Snyder does not attempt to explain how the Board's admission of this evidence over her objection resulted in a clear and harmful abuse of discretion. And, in any event, the AJ explained "even if the [Navy] had not provided this evidence, my finding would be no different due to the testimony provided by [Ms. Snyder] and Mr. Fontenot at the hearing." J.A. 24 n.9. Thus, even if the AJ erred in admitting the evidence, any such error would be harmless. Substantial evidence supports the AJ's dismissal of Ms. Snyder's claim without regard to the Navy's rebuttal evidence. Thus, we conclude the Board did not commit reversible error in affirming Ms. Snyder's furlough.

## CONCLUSION

For the foregoing reasons, we *affirm* the judgment of the Board upholding Ms. Snyder's furlough.

## **AFFIRMED**

### COSTS

No costs.