# United States Court of Appeals for the Federal Circuit

2006-3098

THOMAS F. KALIL,

Petitioner,

v.

DEPARTMENT OF AGRICULTURE,

Respondent.

George M. Chuzi, Kalijarvi, Chuzi & Newman, P.C., of Washington, DC, argued for petitioner.

Brian M. Simkin, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Allison Kidd-Miller, Trial Attorney. Of counsel on the brief was Albert T. Berry, United States Department of Agriculture, Office of the General Counsel, of Washington, DC.

Appealed from: United States Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

2006-3098

THOMAS F. KALIL,

Petitioner,

v.

DEPARTMENT OF AGRICULTURE,

Respondent.

_____

DECIDED:  February 16, 2007

_____

Before RADER, Circuit Judge, CLEVENGER, Senior Circuit Judge, and PROST, Circuit Judge.

RADER, Circuit Judge.

The Merit Systems Protection Board (the Board) affirmed the United States Department of Agriculture's (Agency's) decision to suspend Thomas F. Kalil for fourteen days.  See Kalil v. Dep't of Agric., DC1221020792-B-2 (M.S.P.B. Oct. 24, 2005) (Final Order), denying petition for review of, Kalil v. Dep't of Agric., DC1221020792-B-2 (M.S.P.B. Dec. 21, 2004) (Initial Decision).  Because the Board committed no reversible errors, this court affirms.

I

At the time of his suspension, Mr. Kalil was an assistant to the Deputy Administrator of the Farm Loan Programs (FLP), a part of the Agency's Farm Service Agency (FSA).  Among other programs, the FLP administers the Shared Appreciation Agreement (SAA). This program uses a debt reduction concept to help small and

minority farmers avoid foreclosure.  A dispute arose over the repayment feature of the SAA program.  The repayment clause reads:

> (2) Terms. Shared appreciation agreements shall have a term not to exceed 10 years, and shall provide for recapture base on the difference between the appraised values of the real security property at the time of restructuring and at the time of recapture.
>
> (3) Percentage of recapture.  The amount of the appreciation to be recaptured by the Secretary shall be 75 percent of the appreciation in the value of such real security property if the recapture occurs within 4 years of the restructuring, and 50 percent if recapture occurs during the remainder of the term of the agreement.
>
> (4) Time of recapture.  Recapture shall take place at the end of the term of the agreement, or sooner-
>
> > (A) on conveyance of the real security property;
> > (B) on the repayment of the loans; or
> > (C) if the borrower ceases farming operations.

7 U.S.C. § 2001(e).

In the late 1990s, before the present dispute, Mr. Kalil reviewed many case studies of the actual application of the SAA program and prepared a summary for his supervisor, Carolyn Cooksie, the Deputy Director of the FLP.  Mr. Kalil reported that the Agency had on some occasions waived debt recapture unless the subject property had been sold or the farmer had stopped farming before the 10 year term expired.  Indeed, Mr. Kalil found the Agency had published regulatory guidelines waiving recapture after 10 years.  Further, Mr. Kalil found that FLP agents in the field had instructed farmers to follow those guidelines.

In August 2001, however, Mr. Kalil read a newspaper account about litigation over the SAA program, Stahl v. Dep't of Agric., No. A3-01-85 (D.N.D. 2001), in which the Agency was apparently taking a contrary position.  In the litigation, the Agency

advocated that the law required beneficiaries who had neither conveyed their land nor stopped farming to repay 50% of appreciated value of their land/loan collateral just as if they had violated the terms and conditions of the SAA. Although not involved with the Stahl litigation, Mr. Kalil contacted employees in the Loan Servicing and Property Management division (LSPM) of the Agency to inquire if the Agency had in fact changed its position. The LSPM confirmed the Agency had changed its interpretation of the SAA. Based on his conversation with the LSPM, Mr. Kalil decided that neither LSPM nor the Stahl court had received his report from Ms. Cooksie.

As a licensed attorney (although not an attorney for the Agency), Mr. Kalil contacted the District of Columbia bar to determine his ethical responsibility. Mr. Kalil testified that Bar officials advised him to report his concerns. Mr. Kalil further testified that the Bar officials advised him to satisfy his ethical obligation by disclosing his concerns to the Department of Justice (DOJ) attorneys prosecuting the Stahl case.

On August 17, 2001, Mr. Kalil called DOJ Attorney Michael Sitcov to advise him that the Government's position in Stahl was incorrect. Mr. Sitcov strongly disagreed with Mr. Kalil's characterization of the Government's position but advised him to contact the attorney in charge, Charlene Rosen, at the Agency's Office of General Counsel. Unable to contact Ms. Rosen in her office in Washington, D.C., Mr. Kalil left a message for Ms. Rosen's supervisor, Arnold Grundeman. Mr. Kalil then tried to contact Ms. Rosen at the United States Attorney's office in North Dakota. During this attempt, Mr. Kalil alleges his call was transferred to the chambers of the judge handling the Stahl case. In a conversation with the judge's clerk, Mr. Kalil alleges, and the Government disputes, that he said nothing prejudicial to the case.

Shortly thereafter Mr. Sitcov learned of Mr. Kalil's call to the court and contacted Mr. Grundeman. Mr. Grundeman contacted Mr. Kalil to discuss the call to the court. In their conversation, Mr. Grundman alleges Mr. Kalil admitted telling Judge Webb's clerk about the Agency's "attempted fraud" (from the perspective of Mr. Kalil) on the court. Mr. Grundeman then reported his conversation with Mr. Kalil to Ms. Cooksie.

A few weeks later, an FSA official contacted Ms. Cooksie regarding Mr. Kalil's discussion with Judge Webb's clerk. On September 10, 2001, Ms. Cooksie sent an email to Mr. Kalil requesting information regarding his involvement in the Stahl case. In response, Mr. Kalil sent an email to Mr. Grundeman asking if he could respond to Ms. Cooksie's email. Mr. Kalil states he did not receive an answer from Mr. Grundeman. On October 10, 2001, Ms. Cooksie sent another email to Mr. Kalil requesting information. Mr. Kalil responded that he was forwarding her request to Mr. Grundeman. Mr. Kalil also sent an email to Mr. Grundeman expressing his position that he had made a protected disclosure about Ms. Cooksie's performance. Then Ms. Cooksie contacted Mr. Grundeman. Mr. Grundeman advised Ms. Cooksie that she had every right to talk to Mr. Kalil. Mr. Grundeman further asserts he called Mr. Kalil the same day and told Mr. Kalil and that he had an obligation to discuss work related issues with his supervisor.

On February 22, 2002, Ms. Cooksie contacted the human resources department of the FSA and proposed a fourteen-day suspension. She based her recommendation on Mr. Kalil's improper interference with the Stahl litigation, his release of an FSA report without prior approval, his disrespectful treatment of his supervisor, and his refusal to follow instructions. On June 19, 2002, FSA's reviewing official James Little dismissed

the disrespectful treatment count, but sustained the rest. On that basis, Mr. Little approved suspension. In his opinion, Mr. Little did not consider Mr. Kalil's actions as whistleblowing.

In response to the suspension, Mr. Kalil sought corrective action through the Office of Special Counsel (OSC). On July 8, 2002, the OSC dismissed Mr. Kalil's complaint, informing Mr. Kalil of his right to file an individual-right-of-action (IRA) under the Whistleblower Protection Act (WPA). On October 10, 2002 Mr. Kalil filed an IRA but on January 8, 2003 the administrative judge dismissed the complaint without a hearing for lack of jurisdiction. The administrative judge found no genuine WPA disclosures and further faulted Mr. Kalil for failure to exhaust his remedies at OSC. Upon reconsideration, the full Board found Mr. Kalil had exhausted his OSC remedies regarding his disclosures to Mr. Sitcov and Mr. Grundeman and had lodged non-frivolous allegations of an obstruction of justice. Kalil v. Dep't of Agric., 96 M.S.P.R. 77, 83-85 (2004). The Board stated, however, their findings only entitled Mr. Kalil to a hearing and remanded for adjudication on the merits. Id. at 85-86.

On remand, the administrative judge framed the issue as, "whether the agency established by clear and convincing evidence that it would have taken the 14-day suspension action absent the appellant's whistleblowing activities." On that question, the administrative judge upheld the improper interference and failure to follow instruction counts and dismissed the improper release of documents count. The dismissed count dealt with Mr. Kalil's distribution of his report to a Native American National Tribal Development Association (NTDA) meeting. In dismissing the second

count, the administrative judge found Mr. Kalil had provided sufficient evidence showing that he had permission to distribute the report.

## II

This court must affirm unless the agency action is (1) arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) obtained without procedure required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c) (2006); Hayes v. Dep't of Navy, 727 F.2d 1535, 1537 (Fed. Cir. 1984). The Board has jurisdiction over an IRA appeal if the appellant has exhausted his administrative remedies before the OSC and makes "non-frivolous allegations" of whistleblowing activity with evidence that the disclosure was a contributing factor in the agency's personnel action. Yunus v. Dep't of Veterans Affairs, 242 F.3d 1367, 1371 (Fed. Cir. 2001). Under 5 U.S.C. § 2302(b)(8)(A) (2006), whistleblowing activity embraces "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences-(i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health and safety."

When determining whether the same agency action would have taken place without the whistleblowing disclosures, the Board in Geyer v. Department of Justice, 70 M.S.P.R. 682, 688 (1996), aff'd, 116 F.3d 1497 (Fed. Cir. 1997), identified several factors that may be considered, including (1) the strength of the agency's reason for the personnel action excluding the whistleblowing, (2) the strength of any motive to retaliate for the whistleblowing, and (3) any evidence of similar action against similarly situated employees for the non-whistleblowing aspect alone. Greenspan v. Dep't of Veterans

Affairs, 464 F.3d 1297, 1303 (Fed. Cir. 2006). See also Carr v. Soc. Sec. Admin., 185 F.3d 1318, 1323 (Fed. Cir. 1999)(approving use of the Geyer test in "determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing").

The Agency argues that even without any protected disclosures, which it denies, it would have suspended Mr. Kalil anyway. The administrative judge found that the Agency presented strong evidence that Mr. Kalil had interfered with ongoing litigation. In particular, the Agency noted "that the appellant (Mr. Kalil) had, without authority to do so, spoken to Judge Webb's clerk, telling him that the agency 'was not being truthful with the Court with regard to its intent behind Farm Loan Program's Shared Appreciation Agreement [SAA].'" The record included a declaration from Mr. Grundeman discussing Mr. Kalil's admission of an explanation to Judge Webb's clerk that the Agency was attempting to commit fraud on the court.

The record also includes a memorandum from Lynn E. Crooks, Assistant United States Attorney, describing Mr. Kalil's call to ensure that government lawyers told the judge about his report and that he had contacted the judge's clerk as a last resort. Finally, the administrative judge found "incredible" Mr. Kalil's explanation that he had inadvertently contacted the court while attempting to contact Ms. Rosen. Upon review of the record, substantial evidence supports the findings of the Board.

Lastly, at oral argument, counsel for Mr. Kalil argued that this court's Greenspan decision means that once a disclosure qualifies as protected, the character or nature of that disclosure can never supply support for any disciplinary action. 464 F.3d at 1305 ("[W]hen the disclosure is protected the burden is on the agency to show, by clear and

convincing evidence, that it would have disciplined the employee for reasons unrelated to the protected disclosure."). <u>Greenspan</u> does not stand for that expansive proposition. Indeed in this case, the administrative judge found, and this court agrees, that Mr. Kalil's ex parte contact with a court regarding an ongoing litigation was "an outrageous offense, especially for an attorney." Thus, the character of this disclosure itself supplies clear and convincing evidence that the Agency met its burden of proof.

For the foregoing reasons, we affirm the decision of the Board.

<u>AFFIRMED</u>