NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**NATHAN B. CERULLI,**

*Petitioner*

**v.**

**DEPARTMENT OF DEFENSE,**

*Respondent*

---

2019-2022

---

Petition for review of the Merit Systems Protection Board in No. SF-1221-18-0624-W-1.

---

Decided: June 9, 2020

---

JOHN THOMAS HARRINGTON, The Employment Law Group, PC, Washington, DC, for petitioner. Also represented by ROBERT SCOTT OSWALD.

MARGARET JANTZEN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by JOSEPH H. HUNT, ELIZABETH MARIE HOSFORD, ROBERT EDWARD KIRSCHMAN, JR.

---

Before MOORE, TARANTO, and CHEN, *Circuit Judges*.

PER CURIAM.

Nathan B. Cerulli appeals from a decision of the Merit Systems Protection Board (Board) denying Mr. Cerulli's request for corrective action under the Whistleblower Protection Act (WPA). We *affirm*.

## BACKGROUND

Mr. Cerulli is a Fire Protection Inspector at the Defense Logistics Agency (DLA) in San Joaquin, California. He joined DLA in 2009 as a firefighter and became an inspector in 2012.

On December 19, 2016, Assistant Chief Burl Danley was in the workplace kitchen with three firefighters present. Referencing the movie *Predator*, Mr. Danley stated he would "clean house" in "12 days" and mimed shooting an automatic weapon while making gun noises. J.A. 361. The following morning, one of the witnesses, David Reinhard, reported the incident to Chief Bismarck Castro. Mr. Reinhard believed Mr. Danley "was threatening retaliation" for an ongoing investigation against him regarding allegations of workplace bullying and harassment. J.A. 365. The incident was added to the ongoing investigation of Mr. Danley, and he was placed on administrative leave.

Shortly thereafter, Mr. Cerulli learned of Mr. Danley's December 19, 2016, statements from a witness. He also learned that a complaint had been filed, witness statements had been submitted, and an investigation was underway. On December 30, 2016, Mr. Cerulli reported for work and saw that Mr. Danley was scheduled to work on January 2, 2017. Mr. Cerulli knew that the investigation had not yet concluded and noticed that none of the other chiefs were scheduled to work on that day. Concerned, Mr. Cerulli met with one of his supervisors and the person assigned to investigate the incident, Paul Story, to explain

that he did not feel comfortable working with Mr. Danley. J.A. 539-41.

That same day, Mr. Cerulli also expressed his concerns in an email to Mr. Castro, Mr. Story, and his immediate supervisor, Assistant Chief Gregory Watkins. In his email, Mr. Cerulli stated that he considered Mr. Danley's comments to be a serious threat of workplace violence and described concerns with Mr. Danley returning to work while the investigation was still open. Mr. Cerulli further stated that he would use "whatever leave I have, leave without pay included," if Mr. Danley was scheduled to return to work while the investigation was still ongoing. J.A. 439. He then submitted a request for leave and abruptly left for the day. His leave request for January 2 was later denied, but he was permitted to work from an alternative building on that day.

On January 2, 2017, Mr. Cerulli noticed Mr. Danley's vehicle parked outside a storage building near his workstation and became concerned because it was unusual for Mr. Danley to be at that building. After observing Mr. Danley drive away, Mr. Cerulli returned to his workstation, locked the door, and placed a small paring knife into his sock "as a last means ditch effort to be able to protect [himself]" in case of an attack. J.A. 554-55. This was in addition to the duty knife that he routinely carried while working. Mr. Cerulli ultimately did not encounter or otherwise confront Mr. Danley that day.

Between January 3 and January 10, 2017, Mr. Cerulli had several meetings with various supervisors to discuss the safety concerns from his December 30, 2016, email. In particular, on January 10, 2017, Mr. Cerulli met with his direct supervisor, Mr. Watkins, and disclosed that he had armed himself with a paring knife on January 2 because he was "not going to be a victim." J.A. 273. Mr. Watkins was concerned that Mr. Cerulli had armed himself and appeared "visibly shaken and emotional," even after learning

that Mr. Danley had a legitimate reason for being at the storage building that day. *Id.* Feeling troubled, Mr. Watkins filed a police report and was directed to place Mr. Cerulli on administrative leave for a day.

Based on Mr. Cerulli's behavior between December 30, 2016, and January 10, 2017, Mr. Castro ordered Mr. Cerulli to undergo a fitness for duty examination to determine his "continued capacity to meet the requirements of [his] position." J.A. 263-64. The order explained that a Fire Protection Inspector must be able to "maintain alertness, self-control and emotional stability to work in conditions of stress, confusion, panic, physical injury and even death that occurs at major disasters." J.A. 264. This requirement was also included in the formal description of the position's responsibilities enclosed with the order.

On the advice of his representative, Mr. Cerulli did not appear for his scheduled fitness for duty examination on January 24, 2017, believing that he should instead negotiate to be evaluated by his personal physician. Subsequently, Mr. Cerulli submitted to a fitness for duty examination the following month in which he was cleared for duty by Dr. Corky Hull at DLA. During the exam, Dr. Hull primarily performed a mental status evaluation and asked questions concerning Mr. Cerulli's mental health.

For failing to attend the January 24 exam, Mr. Castro proposed a 30-day suspension from duty without pay, which Chief Andy Eskew mitigated to 10 days given Mr. Cerulli's strong record of performance, agency awards, and lack of prior disciplinary action. Mr. Cerulli served his suspension from April 16–25, 2017.

On September 6, 2017, Mr. Cerulli filed a complaint with the Office of Special Counsel (OSC). The OSC closed its inquiry into his complaint on April 27, 2018. Mr. Cerulli then filed an Individual Right of Action (IRA) with the Board on June 29, 2018, alleging that the agency had subjected him to a fitness for duty examination and suspension

in violation of the WPA because they were in retaliation for making protected disclosures in his December 30, 2016, email and during various subsequent meetings with supervisors. Based on the testimony and evidence presented, the administrative judge found that Mr. Cerulli had made a protected disclosure in his December 30 email and had established that his disclosure was a contributing factor in the agency's personnel actions. But the administrative judge also found that the agency had proven by clear and convincing evidence that it would have taken the same disciplinary actions notwithstanding Mr. Cerulli's disclosure and therefore that corrective action was not warranted. Because Mr. Cerulli did not appeal the administrative judge's initial decision to the full Merit Systems Protection Board, it became the final decision of the Board on April 18, 2019. *See* 5. U.S.C. § 7701(e)(1). Mr. Cerulli timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

Under our limited review, we must affirm a decision of the Board unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Substantial evidence is "relevant evidence" that "a reasonable mind might accept as adequate to support a conclusion." *Snyder v. Dep't of the Navy*, 854 F.3d 1366, 1372 (Fed. Cir. 2017).

The WPA prohibits an agency from taking adverse personnel actions[1] against employees in response to protected

---

[1]    A "personnel action" includes, among other things, "a decision to order psychiatric testing or examination" and "disciplinary or corrective action." 5 U.S.C. § 2302(a)(2)(A).

disclosures made by the employees.  5 U.S.C. § 2302(b)(8)–(9).  Protected disclosures include "any disclosure of information by an employee . . . which the employee . . . reasonably believes evidences—(i) any violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."  *Id.*  An employee who believes he has been subjected to illegal retaliation must prove by a preponderance of the evidence that he made a protected disclosure that contributed to the agency's action against him.  *See Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012).  "If the employee establishes this *prima facie* case of reprisal for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure.'"  *Id.* at 1364 (quoting 5 U.S.C. § 1221(e)).

In determining whether an agency has established that it would have taken a personnel action in the absence of a protected disclosure, the Board may consider: (1) "the strength of the agency's evidence in support of its personnel action;" (2) "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision;" and (3) "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated."  *Carr v. Soc. Sec. Amin.*,185 F.3d 1318, 1323 (Fed. Cir. 1999).

## I. *Carr* Analysis

Substantial evidence supports the Board's analysis of the *Carr* factors with respect to the fitness for duty order

---

The parties agree that the fitness for duty examination and suspension both constitute personnel actions within the meaning of the statute.

and the 10-day suspension.[2] As explained below, the Board reasonably found that the agency proved by clear and convincing evidence that it would have taken the same personnel actions in the absence of Mr. Cerulli's protected disclosure.

## A.   Strength of the Agency's Evidence

As to the first *Carr* factor, the Board found strong evidence supporting the agency's decision to order a fitness for duty examination. The Board relied on the fitness for duty order itself, which described specific instances of Mr. Cerulli's conduct that gave the agency concern as to whether he was mentally and emotionally stable enough to continue performing the duties of a Fire Protection Inspector. These instances include: (1) Mr. Cerulli abruptly leaving work without permission on December 30, 2016, despite the fact that Mr. Danley was not present on that day; (2) hypervigilance by way of arming himself with a paring knife, seeking leave, and monitoring Mr. Danley's activities on January 2, 2017; (3) discussions regarding Mr. Cerulli's prior PTSD diagnosis; and (4) Mr. Cerulli's feelings of being "violated" and "sick to [his] stomach" from a heated conversation with Mr. Eskew and Mr. Castro on January 3, 2017. J.A. 263. Moreover, the Board cited the testimony of Mr. Watkins, who described Mr. Cerulli's physical appearance during their January 10 meeting as "very upset and emotional, his face was red, and his eyes teared up." J.A. 24. Mr. Castro also testified that he ordered the fitness for duty examination out of concern for Mr. Cerulli's "emotional wellbeing" and "safety of the organization" because "it

---

[2]    The Board's *Carr* analysis is premised on the undisputed finding that Mr. Cerulli's December 30, 2016, email constitutes a protected disclosure that was a contributing factor in the agency's personnel actions. We address Mr. Cerulli's arguments regarding whether there were additional protected disclosures *infra* (§ II).

could be very dangerous . . . if [he was] not a hundred percent there." J.A. 702. While acknowledging that Mr. Cerulli did not threaten anyone, the Board nonetheless emphasized his decision to arm himself with a knife, observing that no other employee—including the three witnesses to Mr. Danley's statements—was so greatly concerned that they "absented themselves from working with [Mr. Danley] or armed themselves as a defensive measure." J.A. 25. Accordingly, substantial evidence supports the Board's finding that "the agency had a legitimate reason to order [Mr. Cerulli] to undergo a fitness for duty examination." *Id.*

The Board also found "strong evidence in support of the 10-day suspension" imposed on Mr. Cerulli. J.A. 26. It is undisputed that Mr. Cerulli did not attend his scheduled fitness for duty examination on January 24, 2017, and that he was suspended for failing to follow orders. The Board rejected the argument that the 10-day suspension was unwarranted because the fitness for duty order was itself improper. Instead, the Board observed that even if an order is improper, "an employee must comply with a lawful order and grieve the propriety of that order later." *Dias v. Department of Veterans Affairs*, 102 M.S.P.R. 53, 57 (2006), *aff'd*, 223 Fed.Appx. 986 (Fed. Cir. 2007).

On appeal, Mr. Cerulli argues that the fitness for duty order was not just inappropriate, but unlawful, and any personnel action resulting from his failure to follow the order cannot satisfy the first *Carr* factor. Relying on the Board's finding that the fitness examination included "a psychiatric component," J.A. 13-14, Mr. Cerulli cites *Harris v. Department of Air Force*, 62 M.S.P.R. 524 (1994), for the proposition that an employee may not be disciplined for

refusing to participate in a psychiatric examination that violates 5 C.F.R. § 339.301(e)(1).[3]  *Id.* at 527-29.

Section 339.301(e)(1) states that an agency may only order a psychiatric examination under two circumstances: (i) a properly-ordered physical examination "indicates no physical explanation for behavior or actions which may affect the safe and efficient performance" of the employee or others; *or* (ii) "a psychiatric examination or psychological assessment is part of the medical standards for a position . . . or required under a medical evaluation program." *Id.*  In *Harris*, the Board ruled in favor of an employee who was wrongly disciplined for failing to cooperate in a psychiatric examination violating § 339.301(e)(1).  With respect to § 339.301(e)(1)(ii),[4] the Board found that "there [was] no

---

[3]    Mr. Cerulli also argues that the fitness for duty order violates 5 C.F.R. § 339.301(e)(2), which requires a psychiatric examination authorized under (e)(1) to be conducted "by a licensed physician certified in psychiatry by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Psychiatry and Neurology, or by a licensed psychologist or clinical neuropsychologist." *Id.*  While the Board found that Dr. Hull was not qualified under § 339.301(e)(2), we find that the order itself does not violate § 339.301(e)(2).  Nothing in the order requires Mr. Cerulli to receive his examination from a physician that does not meet the requirements of § 339.301(e)(2).  The order merely specifies that the examination will be conducted by a "physician at the Occupational Health Office."  J.A. 264.

[4]    The Board in *Harris* also found that § 339.301(e)(1)(i) did not apply because there was no evidence that the employee's behavior or actions affected the safe and efficient performance of herself or others.  62 M.S.P.R. at 528.

allegation or evidence to indicate that [the employee] held a position that had medical standards." 62 M.S.P.R. at 528.

Here, unlike in *Harris*, the record supports that Mr. Cerulli's position does require medical standards implicating a psychological assessment. Specifically, a description of the Fire Protection Inspector position enclosed with the fitness for duty order states that the position requires the "[a]bility to maintain alertness, self-control, and emotional stability to work in conditions of stress, confusion, panic, and physical injury and even death." J.A. 269. We therefore find Mr. Cerulli's argument that the fitness for duty order violates § 339.301(e)(1) unavailing.

## B.   Motive to Retaliate

With respect to the second *Carr* factor, the Board properly found little retaliatory motive by the agency officials involved in recommending or issuing the fitness for duty order and 10-day suspension. As an initial matter, the Board found no evidence that Mr. Castro or Mr. Eskew were beholden to Mr. Danley or "implicated directly in the disclosure." J.A. 27. The Board relied on undisputed evidence that, at the time of Mr. Cerulli's disclosure, his supervisors had already initiated an investigation into Mr. Danley's December 19, 2016, statements and placed him on administrative leave. The Board further remarked that "perhaps most telling as to whether the agency retaliated against [Mr. Cerulli], there is no evidence in the record that the agency retaliated against other employees who reported Danley's comment, including Reinhard, who was first to report his concern of the threat." J.A. 29. Based on this evidence, the Board could not "conclude that any of the agency officials had a strong motive to retaliate." J.A. 27.

Mr. Cerulli, however, argues that his disclosures differed from that of other employees who reported Mr. Danley's comments because his December 30 email "created a written record" that "reached several levels of his supervisory chain." Appellant's Br. 50. Mr. Cerulli further argues

that the repeated nature of his disclosures threatened the agency's "ability to stifle discussion of Danley's behavior." Appellant's Br. 51. However, this ignores the fact that a written record was already under development in the ongoing investigation (J.A. 359-66), and Mr. Danley's behavior was already an active topic of discussion in the workplace.

The weight to be given to the evidence of record is a "judgment call[] that rest[s] primarily within the discretion of the Board." *Koenig v. Dep't Of Navy*, 315 F.3d 1378, 1381 (Fed. Cir. 2003). Based on the record before us, substantial evidence supports the Board's finding that the evidence of motivation to retaliate was relatively weak.

## C. Treatment of Others Who Were Similarly Situated

As to the third *Carr* factor, the Board correctly found the comparator evidence submitted by the agency weighed in the agency's favor. With respect to the fitness for duty examination, the Board considered a comparable case, MD, who was accepted into a leadership program within the agency but was dismissed within a week. The agency recommended[5] that MD undergo a fitness for duty examination based on "unusual behaviors." J.A. 311. Specifically, MD had told various lies, took oxycodone without a valid prescription, and admitted to having had a "mental break from reality." *Id.*

With respect to the 10-day suspension, the Board found EA to be comparable. EA was suspended for failing to follow instructions to provide medical documentation in connection with a fitness for duty examination to determine whether he was cleared to return to work. Similar to Mr. Cerulli's situation, a 30-day suspension was originally

---

[5]    The agency offered for MD to undergo a fitness for duty examination but could not require him to submit due to the nature of his position.

proposed, which was subsequently mitigated to 14 days. Neither MD nor EA were whistleblowers.

Mr. Cerulli argues that neither MD nor EA are appropriate comparators. According to Mr. Cerulli, his concern for Mr. Danley's behavior and desire to protect himself was reasonable whereas MD's drug use and lying was not. However, as the Board stated in its decision, what makes MD an appropriate comparator is the fact that both MD and Mr. Cerulli "demonstrated behavior that caused an objective concern" to management regarding the "ability to perform essential functions of [the] position," and in both situations, the agency proposed a fitness for duty examination. J.A. 28. While not a rigorous comparison, we find that substantial evidence supports the Board's determination that this comparator evidence weighs in favor of the agency.

Mr. Cerulli further argues that EA is not an appropriate comparator because EA's suspension was justified whereas his was not. Specifically, Mr. Cerulli contends that a demand for medical information must be followed whereas an unlawful order for a psychological examination need not be followed. However, as explained above, the fitness for duty order was lawful and failure to comply with it provided the agency with a legitimate reason to suspend Mr. Cerulli. We therefore find this argument unpersuasive and conclude that the Board reasonably determined EA's circumstances to be "very similar." J.A. 28.

Mr. Cerulli also argues that the Board failed to consider a comparator that the government did *not* proffer: Mr. Danley. According to Mr. Cerulli, Mr. Danley "made a threat of violence," was investigated, and was ultimately only issued a letter of warning, despite prior complaints of bullying. Appellant's Br. 56. In contrast, Mr. Cerulli was supposedly "accused of similar misconduct" but was given a fitness for duty order and suspended without any investigation. *Id*. at 56-57. We disagree that Mr. Cerulli and

Mr. Danley are similarly situated.  As an initial matter, we note that the nature of the "misconduct" differs.  Mr. Danley was accused of a verbal threat, which management determined to be an "avoidable" incident of "perception and misunderstanding rather than an attempt . . . to intimidate an insubordinate" after investigation. J.A. 430. While expressing disappointment over his poor interpersonal skills as a manager, Mr. Danley's supervisors did not express any concerns over his mental or emotional stability or ability to perform the essential functions of his position.  Mr. Cerulli, on the other hand, acknowledged that he had armed himself with a knife, and his supervisors perceived increasing levels of emotional distress and hypervigilance that cast doubt on his ability to perform the essential functions of his position.  We therefore find that the Board reasonably excluded Mr. Danley as an appropriate comparator.

Based on the record, substantial evidence supports the Board's decision that the agency properly established by clear and convincing evidence that it would have taken the same personnel actions even absent Mr. Cerulli's protected disclosure.

## II. Protected Disclosures

It is undisputed that Mr. Cerulli's December 30, 2016, email constitutes a protected disclosure under the WPA and that it was a contributing factor to the agency's fitness for duty order and suspension decision.  However, Mr. Cerulli argues that the Board erred by not finding that he made additional protected disclosures during various meetings with supervisors between December 30, 2016, and January 10, 2017, because these conversations all had the *same* "content and tone" as the December 30 email.  Appellant's Br. 38.  Mr. Cerulli further argues that this error is not harmless because these additional disclosures preclude the government from establishing independent

causation for its personnel actions.[6]  Mr. Cerulli alleges that "nearly every justification DLA has for its fitness for duty order relies on [his] repeated protected disclosures," and thus, the agency's reasons for issuing the fitness for duty order are "inextricably linked" to his repeated protected disclosures. Appellant's Reply Br. 3-4.  We disagree and find that any failure by the Board to find additional disclosures was harmless.

The agency did not rely on the content or repeated nature of Mr. Cerulli's disclosures to justify its personnel actions.  While the fitness for duty order references Mr. Cerulli's meetings with supervisors during the relevant period, it also cites concern for his mental and emotional health based on his conduct during that period. *See supra,* § I.A.  The Board also cited "compelling and credible testimony" from Mr. Cerulli's supervisors regarding concern for his mental wellbeing. J.A. 23-25.  Given the order's discussion of Mr. Cerulli's conduct and perceived emotional state, the Board correctly found that the agency relied on reasons other than the content of Mr. Cerulli's December 30 email in justifying the fitness for duty order.  Likewise, the agency did not rely on that same content[7] when later disclosed in Mr. Cerulli's conversations with supervisors between December 30, 2016, and January 10, 2017.

To the extent Mr. Cerulli argues that his conduct cannot be separated from the content of his disclosures, we disagree.  The WPA does not require "that the adverse action

---

[6]    Mr. Cerulli also argues that his repeated disclosures "were a threat to his supervisors that increased their motive to retaliate against him." Appellant's Reply Br. 3-4.  For the reasons discussed *supra* (§ I.B.), we find this argument unpersuasive.

[7]    Both parties agree that these conversations all had the same content as the December 30 email.  Appellant's Br. 38, Appellee's Br. 17-18.

be based on facts completely separate and distinct from protected whistleblowing disclosures." *Watson v. Dep't of Justice*, 64 F.3d 1524, 1528 (Fed. Cir. 1995) (internal quotations omitted). Nor does the act shield an employee's conduct from agency action merely by virtue of having made a protected disclosure. *See id.*; *Greenspan v. Dep't of Veterans Affairs*, 464 F.3d 1297, 1305 (Fed. Cir. 2006). Moreover, we have expressly rejected the argument that "the character or nature of [a protected] disclosure can never supply support for any disciplinary action." *Kalil v. Department of Agriculture*, 479 F.3d 821, 825 (Fed. Cir. 2007); *see also Duggan v. Department of Defense*, 883 F.3d 842, 846-47 (9th Cir. 2018).[8]

### III. Credibility

Finally, Mr. Cerulli argues that the Board erred in evaluating his credibility. In particular, Mr. Cerulli takes issue with a footnote[9] in the Board's decision finding his testimony "less than credible" because he "had a tendency to exaggerate when describing events involving others" while "downplay[ing] his own conduct that might be

---

[8]    *Greenspan*, cited by Mr. Cerulli, is consistent with these principles. There, we found in favor of an employee who had been disciplined for bluntly criticizing management. We concluded that the protections of the WPA are not removed simply because protected subject matter is conveyed in a "blunt and arrogant manner." 464 F.3d at 1304-305. However, we declined to consider whether the employee's behavior went beyond blunt to become "disruptive" or "disrespectful" because the agency had not relied on such a ground at the time of discipline. *Id.* at 1305.

[9]    The footnote references two specific examples of such behavior, including an instance in which Mr. Cerulli testified that Mr. Danley had made "many, many, many death threats," but when asked, could not name a specific threat aside from the events at issue. J.A. 5.

problematic." J.A. 5.  While Mr. Cerulli contends that the Board ignored countervailing evidence of his credibility, he nonetheless acknowledges that the Board often "believed and accepted [his] version of events over [the agency's]." Appellant's Br. 35.

"As an appellate court, we are not in a position to reevaluate these credibility determinations, which are not inherently improbable or discredited by undisputed fact." *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1149 (Fed. Cir. 1997).  The Board's analysis reflects a careful weighing of the facts as presented with the credibility of the testifying witness, and as a result, its credibility determinations are not wholly dismissive of one party or another.  Accordingly, we decline to disturb the Board's credibility determinations.

## CONCLUSION

We have considered Mr. Cerulli's remaining arguments and find them unpersuasive.  For the foregoing reasons, the decision of the Board is *affirmed*.

## **AFFIRMED**

### COSTS

No Costs.